1          UNITED STATES DISTRICT COURT
              DISTRICT OF KANSAS
2

UNITED STATES OF AMERICA,        )
3                                )
          Plaintiff,             )
4                                )
vs.                              ) Case No. 16-20078-JAR
5                                )
MATHEW B. CLARK,                 )
6                                ) Kansas City, Kansas
          Defendant.             ) Date:  8 September, 2021
7  .........................

8          TRANSCRIPT OF RESENTENCING
         BEFORE THE HONORABLE JULIE A. ROBINSON
9      UNITED STATES CHIEF DISTRICT COURT JUDGE

10
              A P P E A R A N C E S
11

FOR THE PLAINTIFF:
12
          Mr. Tristram W. Hunt
13        OFFICE OF THE UNITED STATES ATTORNEY
          500 State Avenue
14        Suite 360
          Kansas City, Kansas 66101
15

FOR THE DEFENDANT:
16
          Mr. Timothy H. Burdick
17        OFFICE OF THE FEDERAL PUBLIC DEFENDER
          500 State Avenue
18        Suite 201
          Kansas City, Kansas 66101
19

20

21

22

23

24  _____
          Proceedings recorded by machine shorthand,
25  transcript produced by computer-aided transcription.

1                           I N D E X

2
     Defendant's Witnesses:                                    Page

3
     JENNIFER SWEETON
4        Direct Examination by Mr. Burdick                    4
         Cross-Examination by Mr. Hunt                       25
5        Redirect Examination by Mr. Burdick                 30

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2         THE COURT:  We're here in United States versus Mathew

3    Clark, 16-20078.  Your appearances, please.

4         MR. HUNT:  May it please the Court, Tris Hunt

5    appearing on behalf of the United States.

6         MR. BURDICK:  Tim Burdick on behalf of Mr. Clark.

7    Mathew Clark appears in person.

8         THE COURT:  All right.  And we are here for

9    resentencing.  We've set this as an evidentiary sentencing

10   hearing.  Do either party plan on presenting evidence?

11        MR. HUNT:  The government does not.

12        MR. BURDICK:  Judge, we will have one witness.

13        THE COURT:  All right.  So Mr. Clark objects to the

14   base offense level of 34 on the basis of the drug amounts being

15   calculated to include anything over 5 grams of methamphetamine.

16        Is that correct?

17        MR. BURDICK:  Yes, Judge.  If you'll recall, this was

18   an objection that was made at the original sentencing as well.

19   It's based on some Tenth Circuit dicta, and we're essentially

20   trying to preserve a legal issue to be able to present to the

21   Tenth Circuit.

22        And so there's no case law in the Tenth Circuit or

23   elsewhere that holds directly this argument.  In fact, the law

24   is to the contrary, but there's some dicta that we think could

25   be used to argue in the future, and that's the basis for the

```
 1  objection.
 2        THE COURT:  I understand.  All right.  Why don't we
 3  start with your witness.
 4        MR. BURDICK:  Thank you, Judge.  At this time we would
 5  call Dr. Jennifer Sweeton.
 6                      JENNIFER SWEETON,
 7  called as a witness on behalf of the defendant, having first
 8  been duly sworn, testified as follows:
 9        MR. BURDICK:  Judge, is it your preference that the
10  witness keep her mask on or take it off or how would you like
11  that -- okay.
12        Dr. Sweeton, you're free to take your mask off for
13  testimony.
14        THE WITNESS:  Okay.  Great.  Thanks.
15        MR. BURDICK:  I guess I have the same question, Judge.
16  Would you prefer me to leave mine on with questioning?
17        THE COURT:  It's easier for the court reporter
18  obviously if she can read your lips as you're speaking, so if
19  you're comfortable with that, you can remove your mask as well.
20        MR. BURDICK:  Okay.  Thank you.
21                      DIRECT EXAMINATION
22  BY MR. BURDICK:
23  Q.  Dr. Sweeton, could you please state and spell your name for
24  the record.
25  A.  Sure.  My name is Jennifer Sweeton.  Spelled
```

1  J-e-n-n-i-f-e-r.  Last name is Sweeton, S-w-e-e-t-o-n.

2  Q.   Dr. Sweeton, a copy of your CV has been provided to the

3  Court previously, but I would like for you to share with us

4  your relevant educational background information just to

5  refresh everyone's memory.

6  A.   Sure.  I'm a licensed clinical psychologist and a forensic

7  psychologist as well.  I completed my doctoral training at the

8  Stanford PGSP PsyD Consortium.  I know that's a mouthful.  But

9  a consortium program between Stanford University Medical School

10  and Pacific Graduate School of Psychology.

11     I've been working in private practice for about six years

12  or so, and prior to that time I served in a couple of

13  capacities.  I was a psychologist for the VA system, and I also

14  worked for a period of time for Indian Health Service as a

15  clinic director.

16  Q.   Okay.  I would like to ask you a little bit about that.

17  The work that you did with the VA system, can you describe what

18  that entailed?

19  A.   Sure.  Mainly with veterans I worked providing assessment

20  and mainly therapy for post-traumatic stress disorder and some

21  other conditions as well:  So depression, mood disorders,

22  anxiety disorders, substance use disorders, anything they were

23  presenting with.  But the main thing I worked the most with was

24  post-traumatic stress disorder.

25  Q.   How long did you work there?

1    A.    I worked there for about three years, I think.

2    Q.    Okay.  You said that you also did some work with Indian

3    Health Services.  Can you describe that for us?

4    A.    Sure.  I was helping them integrate their primary care

5    services into their mental health services for three different

6    locations.  So working with native Americans in Clinton,

7    Oklahoma, mainly kind of on the programming and administrative

8    side, but also providing psychotherapy for a variety of

9    conditions for them.

10   Q.    Okay.  And how long did you do that?

11   A.    That was for about six months, I want to say, before I went

12   into private practice.

13   Q.    Okay.  And would you share with us a little bit about your

14   private practice, what do you find yourself doing most often

15   and what roles are you filling in private practice?

16   A.    Sure.  So I'm the owner of a group practice in Olathe,

17   Kansas, called Kansas City Mental Health Associates, and we are

18   a trauma informed group practice, so every clinician has a

19   different specialty, but everyone focusing mainly on trauma.

20        My main specialty is the treatment of trauma and stressor

21   related disorders, including but not limited to post-traumatic

22   stress disorder as well as the different conditions that tend

23   to go along with or comorbid with PTSD.  So I mainly provide

24   treatment for that condition, and I also do quite a bit of

25   assessment work too and some forensic work.

1   Q.   And so when you say that everybody in your group has some

2   training or focus on trauma related issues, is that something

3   that you focus on during your education piece or is this more

4   experience based as you get out in practice?

5   A.   Both, both.  So it was definitely an emphasis in my

6   training I would say more so than other individuals who had

7   other interests.  So we're trained to be generalists, but it

8   was with an emphasis on PTSD.  Since then most of my work has

9   been in PTSD, most of my clinical work since graduation.

10  Q.   Have you been involved in any research or published any

11  articles with regard to trauma and PTSD?

12  A.   Yes.  It has been a while.  But, yes, I have.

13  Q.   Can you share those with us?

14  A.   Sure.  And I believe you'll find these on my CV as well.

15  So I published a few different articles with Dr. Betty

16  Pfefferbaum.  I want to say this was around 2013, 2012, looking

17  at different factors that would lead to -- different traumas

18  that would lead to different types of outcomes when the traumas

19  were with children, especially looking at disasters such as

20  terrorist events or natural disasters.

21  Q.   Okay.  If we could now turn to your evaluation of

22  Mr. Clark.  Can you start by sharing with us what the purpose

23  of your evaluation was?

24  A.   The purpose of my evaluation for Mr. Clark was to evaluate

25  him for PTSD to determine if he at that time met that criteria

1   for PTSD and, if so, what that might mean about his

2   decisionmaking, his behavior, and what to expect potentially in

3   the future given what his symptoms were at the time.

4   Q.   And what sources did you rely on in terms of evaluating

5   Mr. Clark as an individual?

6   A.   Sure.  There was a small -- a number of collateral sources,

7   memos from what I remember that I reviewed.  I also spent a

8   couple of hours with Mr. Clark conducting a clinical diagnostic

9   interview but mainly focusing on that trauma, PTSD piece.  And

10  I conducted the CAPS-5, which stands for the Clinician-

11  Administered PTSD Scale, and 5 is just the version of that

12  tool.

13  Q.   And the memos that you're talking about, are these people

14  in Mr. Clark's life that knew him when he was younger or have

15  known him for several years?

16  A.   Yes.

17  Q.   Okay.  And I think we'll talk about a little bit more about

18  the CAPS-5 here in just a little bit, but I'd like to have you

19  share with us some of the, what I think you've described as

20  potential traumatic events in Mr. Clark's lifetime, and I'm

21  basing some of this information from your report.

22       One of the major ones that you report is in 2004 when

23  Mathew was 13 and his brother died.  Can you describe that for

24  us?

25  A.   Sure.  From what Mr. Clark reported to me, he had a brother

16-20078-JAR    USA v. MATHEW B. CLARK    09.08.21

1   Kevin who was about nine years older than him who had been in

2   prison and shortly after being released from prison had

3   overdosed, died from an overdose of drugs, and this was the way

4   he described it, really a pivotal traumatic event in his life,

5   the most impactful one.

6   Q.   And for -- from the information that you reviewed, talking

7   to Mr. Clark and reviewing memos from other people, was that

8   consistent with what people reported?

9   A.   Yes.

10  Q.   Both the event and it's effect on Mr. Clark?

11  A.   Yes.

12  Q.   You report in 2009 at age 19 Mr. Clark was shot at while he

13  was in a vehicle.  What can you tell us about that?

14  A.   Sure.  There were a few instances that were similar that

15  were spread out over a period of a few years, but I believe

16  with that particular instance, I think he was driving with some

17  friends, I believe, so maybe late at night when he was shot at.

18  If I'm remembering this event right, potentially shot at 17

19  times.

20  Q.   Okay.  And then in 2012 at age 22 there's an instance where

21  Mr. Clark was actually shot in his backyard.  Can you share

22  some information about that with us?

23  A.   Sure.  What Mr. Clark had reported about that was that he

24  was in the backyard and his friend was with him and had been

25  shot, I believe, in the stomach, and I believe Mr. Clark had

1   been shot in that event also.

2   Q.   And were there other events that you learned about during

3   your time with Mr. Clark in reviewing material back when he was

4   younger that maybe weren't as emphasized by Mathew but were

5   nonetheless traumatic events?

6   A.   Yes.  So starting from I think about the age of three, I

7   believe he had reported that one of the earlier memories was of

8   his father battering his mother, so that was something that he

9   recalled.

10       Some abuse also potentially intermittent by his father,

11   although the relationship was okay at certain periods, and

12   later abuse -- I'm not really sure when it started, maybe

13   around the age of four, I think, with his stepfather, which

14   endured off and on for years.

15   Q.   Do -- we've talked about some abuse during childhood.  Is

16   there an aspect of neglect that also can be considered

17   traumatizing or traumatic in childhood as well?

18   A.   Absolutely, just as much so I would say, depending on the

19   person and the circumstance.

20   Q.   And was that sort of behavior reported surrounding

21   Mr. Clark?

22   A.   I believe so, yes.  Periods of instability.  I remember one

23   instance discussed where he was left alone, I think, for

24   multiple days by his father.  There was substance use in the

25   home, which from the way he described his upbringing had led to

1    some neglectful parenting.  I'm also recalling that he was

2    first homeless I think around the age of 14 -- 13 or 14 when

3    his stepfather kicked him out, so you might classify that as

4    abuse or neglect, but that could probably fall into both

5    categories.

6    Q.    And when you spoke with Mr. Clark, he seemed to relay to

7    you that some of these more recent events and specifically his

8    brother's death were most traumatizing to him, and yet some of

9    these events back in his past were not so much.

10        What does that -- is that unusual or does that give you any

11   insight into Mr. Clark's way in which he's coped with these

12   things?

13   A.    Sure.  I don't think that that's unusual.  A lot of times

14   these events that are ongoing become, for lack of a better

15   word, more normal feeling, become just the way that life is,

16   and these events may not stick out day to day as contained

17   single events because it's just kind of ongoing.

18        So while I'm aware that that would lead potentially to some

19   traumatic reactions, a lot of times people who experience these

20   events won't necessarily say that it was noteworthy if it was

21   just normal life, especially if there were contained events

22   that came later that were especially traumatic.

23   Q.    Okay.  And I think then -- so really we've kind of got to

24   what I wanted to talk to you about next, which was describing

25   for us the difference between these one-time contained events

1    and these ongoing events.

2        The ongoing events that go through a period of time, I've

3    heard that described as complex trauma.  Is that right?

4    A.   It's often called complex trauma or also developmental

5    trauma, yes.

6    Q.   And what is the -- I think you've described the differences

7    between that and a one-time psychological event well, but what

8    is the difficulty in trying to evaluate and quantify a complex

9    trauma?

10   A.   When we're looking at evaluating trauma and putting a

11   number to symptoms, so trying to quantify the severity of it,

12   it's usually easiest to take a one-time contained event and

13   look at just the impact of that event.

14       What can be a little bit more challenging is if it was not

15   a one-time event, maybe it was let's say physical abuse and it

16   happened over a long period of time, then it's usually hard for

17   the individual to pick out just one event and say in isolation

18   this is what this one event has produced in me symptom-wise.

19       So it's hard to disentangle the effects at times.

20   Q.   Is it fair to say that the effects of complex trauma can be

21   just as bad or worse than one-time isolated trauma?

22   A.   Absolutely it can, yes.

23   Q.   Okay.  So I think that brings us then to the testing

24   instrument that you used, the CAPS-5.  As you described before,

25   the purpose is to measure trauma, but can you describe for us

1   how it does that?

2   A.   Sure.   So this is a semi-structured interview assessment

3   tool where you identify, or you have the client identify, the

4   most traumatic event.   So the main reason that the 2004 event

5   was selected is because it was what the client said was most

6   traumatic.

7        So you start with that event and then basically what you're

8   doing is you're going through the diagnostic criteria from the

9   DSM-5.   The DSM-5 is our manual of diagnoses, so every single

10  mental health condition that exists today is in that manual.

11       And so what we're doing is we're going through the DSM-5

12  criteria for post-traumatic stress disorder but not in a casual

13  way, in a pretty structured way where we're asking about

14  specific symptoms that the client has experienced or is

15  currently experiencing that are a result of that particular

16  event.

17       And then we actually quantify it on a scale of 0 to 4 where

18  0 is that there's no presence of the symptom or they never feel

19  that way and 4 would be a lot, extremely likely, or almost

20  every day, kind of depending on what the item is.

21       So then what we can do is we can see how many symptoms from

22  each symptom cluster category are met, and then we can get an

23  overall global view of whether the person has PTSD and, if so,

24  what the severity is and if they also meet criteria for a

25  subtype.

1    Q.   Is the test that you've described, the CAPS-5, is that

2    commonly used for diagnosing PTSD?

3    A.   Yes.  It's the gold standard diagnosis tool for PTSD.

4    Q.   I assume that you have -- you're familiar with that test

5    and have you used it a number of times?

6    A.   Yes.

7    Q.   Okay.  Now, you referred back to Mr. Clark's index trauma

8    as the 2004 event.  That was the passing of his brother,

9    correct?

10   A.   That's right, yes.

11   Q.   Can you share with us what the results or the scoring was

12   for Mr. Clark on the CAPS-5?

13   A.   According to the CAPS-5 at that time, he met diagnostic

14   criteria for post-traumatic stress disorder.

15   Q.   When you said "at that time," you mean when you

16   administered it?

17   A.   Yes, in September of 2020, yes.

18   Q.   Okay.  Can you just share what some of the symptoms are

19   that manifested themselves in Mr. Clark that brought him to the

20   diagnosis of post-traumatic stress disorder?

21   A.   Yes, so in PTSD we have four different clusters of

22   symptoms.  One is called reexperiencing symptoms, and this is

23   when the trauma is on your mind and/or you're dreaming of it.

24   It's when, when you think of it, it produces symptoms in your

25   body and distress and psychological distress.  So it's a way of

1    reexperiencing or in some ways reliving the trauma.  So there's

2    that symptom cluster in PTSD.

3         That's the one where Mr. Clark reported the most severe

4    symptoms, so that symptom cluster was emphasized in his CAPS-5.

5         We also have in PTSD avoidance symptoms.  So avoidance

6    symptoms can include avoiding thinking about, talking about

7    things that have happened.  It might be avoiding people,

8    places, situations that remind you of the trauma.  He did have

9    avoidance symptoms as well.

10        Another symptom cluster that's looked at in PTSD is

11   something called negative alterations in cognition and mood.

12   It's a fancy way of saying that sometimes you think and feel

13   differently after trauma.  He endorsed symptoms that would be

14   consistent with PTSD on that symptom cluster as well, including

15   negative emotions or sometimes called negative affect, loss of

16   interest in things he used to care about, not being able to

17   trust people.  So these are symptoms he endorsed.

18        Finally, the fourth symptom cluster of PTSD is called

19   arousal and reactivity symptoms.  And so these symptoms that he

20   endorsed include feeling on guard all of the time,

21   hypervigilant, having difficulty concentrating, difficulty

22   sleeping, falling and staying asleep.  These were the main

23   symptoms he endorsed from that symptom cluster.

24   Q.  I want to make sure that I'm understanding this correctly

25   then.  As you score the CAPS-5, you are working with just one

1    particular traumatic event in scoring that instrument; is that

2    correct?

3    A.   That's right, yes.

4    Q.   So I mean, it seems to me -- well, I'll just ask you:  Are

5    there shortcomings to the test being focused on one event then?

6    A.   Sure, sure.  You don't get a full picture of a person's

7    life, and although you're asking them about the effects of one

8    event, it's still possible that the effects from other events

9    could be present in those symptoms.

10        So for instance if I'm asking him, do you think about that

11   trauma when you don't want to, that's pretty clearly set to

12   that one trauma so we know that we're talking just about that

13   one trauma.  But if I ask him, are you experiencing difficulty

14   falling or staying asleep at night, there's no way to actually

15   prove that that's just from that one trauma.  That might be due

16   to that one trauma and 50 other things as well, if that makes

17   sense.  So I would say that would be a shortcoming.

18        So we're able to say this person meets criteria for PTSD.

19   We have good reason to believe that, yes, it's a result of this

20   traumatic event, but it may also be a result of other things

21   that have happened in the person's life as well.

22   Q.   So it sounds like it is not just based on reported symptoms

23   but also information both from the client and collateral

24   information that's consistent with traumatic events in the

25   past?

1   A.   I think that is accurate.  I would say that I am -- the

2   score that I'm giving is based on what the client is reporting,

3   so for instance if there is a very severe trauma, I would not

4   be increasing the score of the symptom, if that makes sense.

5   Q.   Kind of jumping back to then what we've talked about as

6   complex trauma, events that are ongoing, can those events or

7   periods of time can they also lead to post-traumatic stress

8   disorder?

9   A.   Yes.

10  Q.   And do the -- is it likely or possible that the symptoms

11  manifest themselves the same way as if it were from one

12  traumatic event or are there differences?

13  A.   Yes.  Yes, it can.  Yes.

14  Q.   Okay.

15  A.   I will add that if it's something that happened many times,

16  let's say someone was abused many times, then when they think

17  about the trauma, it might be that they think about a lot of

18  traumas at different times, so in that way that symptom could

19  be a little bit different, but the symptoms overall are the

20  same.

21  Q.   Okay.  So you said that you have diagnosed Mathew with

22  post-traumatic stress disorder, correct?

23  A.   Yes.

24  Q.   And so can you tell us then -- and I feel like maybe you've

25  talked about this a little bit in scoring the CAPS-5, but how

1  does that manifest itself in Mathew's behavior now?

2  A.   I look at it as a chain of reactions, so it's going to be

3  difficult to say because someone has PTSD these are the

4  behaviors they engage in, so it's not going to be prescriptive.

5       But we know someone who experiences PTSD symptoms is at

6  risk for a whole lot of different coping mechanisms or

7  behaviors.

8       I would say in Mr. Clark's case, from my understanding of

9  the developmental history after this event where his brother

10 passed away, this was something that was very traumatic for

11 him.

12      It then led to some symptoms such as lack of concentration,

13 feeling emotionally overwhelmed, feeling disconnected from

14 people, having more conflicts with people that then led to

15 difficulty in school.  I think at one point he said that he

16 felt like he just gave up after his brother died.  So that led

17 to eventually him getting in trouble at school, having to drop

18 out from my understanding.

19      At the same time there were some family difficulties.  I

20 think I'm recalling in the records that his mother, of course

21 devastated after his brother's death, that shaped parenting,

22 that shaped home life, and it was shortly after the death of

23 his brother that he started using drugs more consistently, then

24 was also kicked out I believe of his home, and so became

25 homeless.

1        And then the things that followed from that point on,

2    again, are not prescriptive, but the risk factors were very

3    well set to take him on a certain trajectory into drug use, of

4    course then leading to needing to make a living, make money,

5    not being able to do that, leading into the decision to sell

6    drugs, and it went from there.

7    Q.    So one of the things you described as kind of the increased

8    substance abuse, and is that -- is it fair to say that

9    oftentimes that's used as like a coping mechanism for the

10   symptoms of post-traumatic stress disorder?

11   A.    Yes, it frequently -- frequently is.  We conceptualize that

12   usually as being actually part of the avoidance cluster of

13   symptoms of PTSD where essentially you're not wanting to think

14   about or remember or feel the terrible feelings about the

15   trauma, and so drugs or alcohol or substances can be used to

16   numb that.

17   Q.    Does post-traumatic stress disorder always lead to

18   substance use disorder?

19   A.    No.

20   Q.    Is it common to find people who suffer from substance use

21   disorder, that they often also suffer from post-traumatic

22   stress disorder?

23   A.    It's almost always the case when addiction is present that

24   there's been traumatic events in the person's past.  They may

25   or may not meet criteria for post-traumatic stress disorder,

1   but overwhelmingly, usually they have some sort of childhood

2   trauma.

3   Q.   Okay.  Obviously we're here and Mathew is here based on

4   convictions for sales of controlled substance, possession of

5   firearms in furtherance of those sales.

6        I know this is an obvious question, but I want to ask it

7   anyway.  Does post-traumatic stress disorder always equate to

8   people selling drugs?

9   A.   No.

10  Q.   Okay.  But what is it about Mathew's environment, his

11  profile, if you will, that makes it likely that he might be in

12  this situation?

13  A.   So we can think about this in terms of risk factors, so

14  what are the risk factors that tend to, according to the

15  research, lead someone to eventually selling drugs.  We know

16  that Mr. Clark has a lot of those risk factors.  So having PTSD

17  is a risk factor; doesn't cause it, but it is a risk factor.

18       Just the presence of traumatic events especially in

19  childhood is a big risk factor.  A home life that is chaotic

20  where there is some neglect or abuse, that is a risk factor.

21  Having a parent use substances is a risk factor.  Being around

22  peers that use substances and especially peers that sell them

23  is a large risk factor as well.  Being separated from parents,

24  living away from parents is its own risk factor also.

25       And there's some additional ones, but I think it's safe to

1   say that Mr. Clark actually has most of the risk factors that

2   we know according to the research exist.

3   Q.   I want to move now to Mr. Clark currently and moving

4   forward a little bit.  How will continued exposure to trauma

5   likely affect Mathew moving forward?

6   A.   Additional exposure to trauma is likely to exacerbate the

7   PTSD symptoms, so it's more likely that those symptoms will

8   become more severe over time with subsequent traumas.

9        We know that trauma is cumulative.  Actually the effects

10  might be more exponential where the more you experience it, the

11  more severe the symptoms tend to get for a lot of people.

12       I would also say given his history with substances that

13  there's an increased likelihood of relapse if he were, let's

14  say, shot at again or experienced other subsequent traumatic

15  events.

16  Q.   What suggestions would you have to provide to Mr. Clark to

17  help him to succeed in the future in dealing with his

18  post-traumatic stress disorder?

19  A.   I think something that's really important is to get

20  treatment for the post-traumatic stress disorder and the

21  substance use.  A lot of times we refer to this as dual

22  diagnosis treatment, so being able to address the PTSD and the

23  substance use because we know these two things, while it's not

24  always the case that they go together, they oftentimes do.  So

25  getting treatment for those two pieces at the same time.

1  Q.   What does that treatment for PTSD look like?

2  A.   I recommend -- I think I recommended in the report

3  evidence-based treatment for post-traumatic stress disorder.

4  This can include cognitive therapies where you're working with

5  your thoughts such as cognitive processing therapy or cognitive

6  behavioral therapy.

7       It can also include exposure therapies where you're

8  processing the traumatic event itself.  This can be through

9  something called EMDR, eye movement desensitization and

10 reprocessing therapy.  It can also be through something called

11 prolonged exposure, which is another exposure-based treatment

12 for PTSD.

13      So one or more of those treatments also with the focus on

14 the substance use would be my recommendation and potentially

15 medication.

16 Q.   When you say "potentially medication," can you expand on

17 that a little bit?

18 A.   Sure.  So I'm not a psychiatrist and I don't prescribe

19 medication, so there's not probably a lot of detail I can give,

20 but a lot of times clients will benefit from seeing a

21 psychiatrist as well as a psychologist or therapist in case an

22 anti-depressant might be helpful.  Even if someone does not

23 meet criteria for depression, sometimes those medications have

24 been found to also help with post-traumatic stress disorder

25 symptoms.

1   Q.   Is there medication treatment that can be geared towards

2   substance abuse as well --

3   A.   Yes.

4   Q.   -- or where you -- okay.   Sorry about that.

5        Were you thinking of that as well or just more towards the

6   post-traumatic stress disorder?

7   A.   I would leave that up to a psychiatrist to evaluate, but a

8   lot of times it will be both depending on the person and the

9   severity.

10  Q.   Dr. Sweeton, one of the things that I noticed in your

11  evaluation is that you -- you mentioned that Mathew during your

12  interaction with him shared a desire to try to change his

13  lifestyle and the way that he interacts with the world.

14       Why was that important in your mind and worth noting?

15  A.   I think that's important because that can predict a

16  person's behavior moving forward when there's a motivation for

17  change.   So we know that people are most motivated to change

18  when there's some distress, there's something about their life

19  that is not working for them, and Mr. Clark communicated that

20  he does not like the current state of his life and he feels

21  motivated to make that different.

22  Q.   And one of the things that I provided for your review was

23  some programming that Mr. Clark engaged in while at CoreCivic.

24  It would have been actually after your evaluation.

25       What is that -- what does that tell you about his

1    motivation?

2    A.   That indicates to me that there's an alignment between what

3    he said in the evaluation and then how he's subsequently

4    behaved.

5    Q.   Okay.  And is that -- I mean, I assume that's a positive

6    thing --

7    A.   Yes.

8    Q.   -- but can you explain to us what's important with the

9    combination of the actual behavior versus just the discussion

10   about the motivation to change?

11   A.   Sure.  I think it indicates that there is a motivation and

12   that, when given the opportunity, he's taking steps to become

13   more educated in areas.  It looks like he completed some

14   programming, actually of a lot of kinds, anything from anger

15   management to entrepreneurship, looking at those topics.

16       It's communicating I think an interest and becoming

17   healthier mentally but also an interest in gaining some skills

18   that might be able to be applied in a vocational setting.

19   Q.   In terms of that, based on your evaluation of Mr. Clark,

20   does he have, for lack of a better word, the tools to succeed

21   in this endeavor?

22   A.   I think he's going to need some help.  I think what's going

23   to be most important is that he not find himself in the exact

24   same context that produced these symptoms and these outcomes in

25   the first place.  So I don't have any reason to think that he

1    has some kind of cognitive deficit or intellectual deficit that

2    would make it impossible for him to ever seek and keep

3    employment, but I think he will need help in obtaining those

4    opportunities and the skill sets needed to be able to be

5    employed.

6    Q.   Is -- are there any other topics that you think are

7    relevant to the judge's decision on how to sentence Mr. Clark

8    in this case that we haven't covered at this point?

9    A.   I think something that sticks out as important to me -- and

10   I'm hoping this answers your question -- is that for Mr. Clark

11   to be rehabilitated, for him to recover, I think it is going to

12   require mental health treatment but also some help functioning

13   in the world, so if that's vocational rehab services, going to

14   a halfway house, but making it so that he has options, better

15   options than the ones that he's had in the past.

16            MR. BURDICK:   Thank you.   I don't think I have any

17   other questions.   Mr. Hunt may though.

18                      CROSS-EXAMINATION

19   BY MR. HUNT:

20   Q.   Good morning, Dr. Sweeton.   I have a few questions for you.

21   How long did you work at the VA and how many presumably

22   veterans did you diagnose with PTSD?

23   A.   I worked at the VA for approximately three years as a

24   psychologist.   During my training years I worked approximately

25   four years, so maybe seven years total.

1          It would be difficult to say the number of veterans I

2    diagnosed with PTSD in a treatment setting, but it's in the

3    hundreds for sure.

4    Q.   And do you know how many of those people became involved in

5    the criminal justice system?

6    A.   Are you asking for a percentage?

7    Q.   Yes.

8    A.   It would be a rough estimation, but in that group about

9    50 percent had had some substantial legal difficulties by the

10   time I had seen them.

11   Q.   And do you know how many of those individuals had problems

12   using drugs?

13   A.   I would estimate probably 60 to 70 percent of those

14   veterans had some kind of problematic substance use at some

15   point.

16   Q.   And do you know how many of those individuals became

17   moderate level drug dealers?

18   A.   I would estimate maybe around 10 percent.

19   Q.   Ten percent.

20        So that would mean 90 percent did not?

21   A.   Could you repeat that?  I'm sorry.  I do have a hearing

22   deficit.

23   Q.   So in this hearing the judge has categorized, I believe,

24   the defendant as a moderate level drug dealer, a

25   methamphetamine dealer.

1        So my question is:  Of those individuals, how many of them

2   became mid-level drug dealers?

3   A.   I wouldn't be able to say because I'm not sure the criteria

4   for mid-level versus any other level.

5   Q.   What about somebody who's an international drug trafficker,

6   trafficking thousands of kilograms of a drug?  Would that be --

7   would you agree that that is a high level drug trafficker?

8   A.   That's not my area of expertise, so I wouldn't be able to

9   say.

10  Q.   Now, what about other types of crimes like burglary?  Are

11  those crimes that are often committed by veterans who have been

12  diagnosed by you with PTSD?

13  A.   It is something that happens sometimes, yes.  I can't say

14  how frequently in terms of the subset of veterans I personally

15  saw.

16  Q.   And other crimes like unlawfully using weapons?

17  A.   Could you repeat that one more time?

18  Q.   Other crimes like unlawfully using weapons.

19  A.   That was very common among the veteran population.  Of

20  course I don't know to what extent my personal experiences with

21  treating those individuals would generalize to all veterans or

22  all people.

23  Q.   Now, you indicated that the defendant reported that his

24  brother overdosed on drugs when he was four years old?

25  A.   His brother, I believe, overdosed on drugs when Mr. Clark

1   was 13, and I think his brother was nine years older.

2   Q.   And I apologize.  You're correct.

3        So it seems to me counterintuitive that he would then go on

4   to use drugs and be a mid-level drug trafficker himself.

5   A.   Is that a question?

6   Q.   Yes.  So it appears that the person who has been

7   traumatized by witnessing or knowing a family member die from

8   an overdose of drugs would go on then to use drugs but more

9   importantly to sell quantities of drugs.

10       How do you account for that?

11  A.   I think it's consistent with the research that those who

12  grow up in a family where the family members are using and,

13  even if they do overdose, that that becomes a major risk factor

14  for modelling that behavior and then them actually using.

15  Q.   So somebody who has a family member who has overdosed on a

16  drug is more likely to become a user and a criminal; is that

17  what you're saying?

18  A.   The research shows they're more likely to use drugs, and

19  there is some research also showing that that becomes a risk

20  factor for the eventual selling of drugs.  It's not the only

21  risk factor, but it is a risk factor.

22  Q.   How about the use of weapons and the possession of large

23  quantities of weapons?

24  A.   I don't know of any research showing a direct link between

25  a family member using drugs and then the person possessing

1    firearms.  I'm not sure about the data on that.

2    Q.   Now, with respect to your examination and the report that

3    you drafted concluding examining Mr. Clark, the information

4    that he provided to you, was there verification of all of the

5    information outside of what Mr. Clark reported to you?

6    A.   There was verification of some information such as the

7    death of his brother and the impact that that allegedly had.  I

8    don't have multiple sources for every single thing he discussed

9    that was traumatic or potentially traumatic.

10   Q.   So you've also indicated later in your testimony on direct

11   with Mr. Burdick that if Mr. Clark does not get the treatment

12   that you recommend and have listed, he is at a high risk of

13   recidivism?

14   A.   I would say he's at high risk for not recovering from the

15   PTSD, and I would say that he's at higher risk for finding

16   himself in the same situation as before.

17   Q.   And on the federal scale of determining criminal history,

18   Mr. Clark is at the second highest level.  He's a criminal

19   history category 5.

20        Is the past determinative of the future in this instance?

21   A.   It is not determinative, no.

22   Q.   But you're saying Mr. Clark, unless he gets this treatment,

23   he is at much higher risk for returning to his behaviors?

24   A.   He's at a higher risk for continuing to suffer from

25   post-traumatic stress symptoms, and if he enters the same

1   context and environment that he was in, he would be at a higher

2   risk for relapse.

3         MR. HUNT:  I don't have anything further, Your Honor.

4         THE COURT:  Anything else?

5         MR. BURDICK:  Yes, Judge.

6         THE COURT:  Go ahead.

7                      REDIRECT EXAMINATION

8   BY MR. BURDICK:

9   Q.   Dr. Sweeton, what is the risk in comparing outcomes for

10  someone like Mr. Clark and his background versus outcomes for

11  military veterans in their given backgrounds or unknown

12  backgrounds?

13  A.   Well, there's going to be a lot of differences I would say

14  between the two.

15  Q.   Can you share those with us?

16  A.   Sure, sure.  With military training, there's a lot of

17  structure, and usually people are entering the military at key

18  developmental periods in early adulthood.  It can be a

19  stabilizing force that people have.

20       So I would say that's one factor is that the military can

21  provide a lot of people with the sense of comradery, family,

22  even support, structure, guidance, goals.  So I would say that

23  that's fundamentally different from my understanding from where

24  Mr. Clark came from.

25       And you could also say that people self-select to be in the

1   military, and so there may be certain personality types or

2   temperaments that tend to be attracted to the military life.

3   There's probably a lot of differences.

4   Q.   I would like to review with you the sources of information

5   that you had with regard to this evaluation.  You had a copy of

6   Mr. Clark's presentence investigation report; is that right?

7   A.   Yes.

8   Q.   And then the memorandums of the interviews involved Megan

9   Clark, which was Mr. Clark's sister, correct?

10  A.   Yes.

11  Q.   And his mother, Carol Clark; is that correct?

12  A.   Yes.

13  Q.   And some family friends, Brad Kirch and Robert Baber,

14  correct?

15  A.   Yes.

16  Q.   And also a letter from Mathew's mother, right?

17  A.   Yes.

18  Q.   Okay.  The information that Mr. Clark provided you, was any

19  of that significantly inconsistent with the information you got

20  from other people or other sources in his life?

21  A.   No.

22          MR. BURDICK:  Thank you.  I don't have any other

23  questions.

24          MR. HUNT:  Nothing further, Judge.

25          THE COURT:  All right.  May Dr. Sweeton be excused?

 1          MR. HUNT:  Yes, Your Honor.

 2          MR. BURDICK:  Yes, Judge.

 3          THE COURT:  Thank you.

 4          Mr. Burdick, did you have any other evidence to

 5   present?

 6          MR. BURDICK:  Judge, we have no other witnesses,

 7   simply some argument, and I do know that Mr. Clark wants to

 8   make a statement at the appropriate time.

 9          THE COURT:  Okay.  Mr. Hunt, did you have anything?

10          MR. HUNT:  No, Your Honor.

11          THE COURT:  We'll start with your argument,

12   Mr. Burdick, because I think you're arguing for a variance.

13          And then, Mr. Hunt, I'll hear from you, and then we'll

14   go from there.

15          MR. BURDICK:  Judge, as I was reviewing everything

16   with regard to Mr. Clark's case, it occurred to me that we have

17   provided the Court with a lot of information.  This is the

18   second sentencing, and so there was a great deal that was

19   provided the first go-round and then reiterated this time, and

20   so I don't know that there's a whole lot that I can add to

21   that.

22          I would just want to remind the Court that we think

23   that there are a number of factors that the Court should

24   consider in determining a variance:  The disparity in the

25   calculation of methamphetamine within the guidelines as either

1   ice, actual, or mixture, and that varying based on geography or

2   even courthouse within a district.

3         The increase in purity levels of methamphetamine, yet

4   no corresponding increase in sentence length of methamphetamine

5   cases nationally over time, which again shows that there are

6   variances being given at quite a great rate.

7         In fact, that occurrence within guideline sentences

8   continues to decrease throughout the nation on methamphetamine

9   cases below -- I think the most recent statistic say that below

10  30 percent of cases ended in a guideline sentence for

11  methamphetamine distribution.

12        The disparity in which the guidelines treat

13  methamphetamine versus other drugs relative to their harm.

14        The speculation that is involved in the cash-to-drugs

15  equivalency that's used in Mr. Clark's case or in many cases in

16  which that's used to calculate relevant conduct.

17        The correspondence or correlation between a decrease

18  in recidivism as people get older, as Mr. Clark will certainly

19  age over the time frame that we're looking at for

20  incarceration.

21        Our nation 's incarceration rate in comparison to

22  those throughout the world.

23        A comparison of similarly-situated defendant with

24  Mr. Clark in this district that was provided in the sentencing

25  memorandum and the quite disparate sentence that they ended up

1    with given so many similarities in their cases, even down to

2    the number and types of counts, the area in which they lived,

3    and ultimately such a wide disparity in the ultimate sentence.

4         Mr. Clark's work at CoreCivic over the last several

5    months once programming was available to him, I think there

6    were 34 certificates that we included in our memorandum,

7    sentencing memorandum addendum for the Court to consider.

8         Mr. Clark's childhood and his life experiences and how

9    that's affected his mental health.

10         And so I do want to talk about that specifically just

11    for a moment because that is more new information that the

12    Court did not have at the previous sentencing.

13         Dr. Sweeton described somebody in Mr. Clark's profile,

14    with his profile being at a greater risk for ultimately selling

15    drugs and basing that on research and listed some of these risk

16    factors.  And these risk factors I think are worth considering.

17         The risk factors that make someone more likely to

18    ultimately sell drugs include substance use.  And, you know,

19    Mr. Clark really dove into substance abuse as a maladaptive

20    coping mechanism for the trauma he has suffered.  He identifies

21    it to the one event in 2004 when his brother passed away, but

22    it's clear that based on information from his sister and from

23    his mother and his own reports that he had been dealing with

24    abuse and neglect for a period of time, and not only that, but

25    then the loss of his brother really caused him to go that

1    direction.

2         You know, even as reported by his mother, she went

3    into substance abuse at the point in which her son passed away.

4    She disclosed that she started to abuse alcohol severely, and

5    I'm certain that that contributed to the home life that

6    Mr. Clark was dealing with.

7         And so the fact that he suffered these traumatizations

8    certainly contributed to his substance use, which then made him

9    at a higher risk factor to finding himself in the position that

10   he's at now.

11        The second risk factor that was discussed was being

12   physically or emotionally abused as a child.  There's reports

13   of Mathew literally being punched in the back by his father, of

14   his father shooting off a gun when he's angry, and this report

15   came from Mathew back when he was a kid, when he wrote a letter

16   to his teacher about if he could change something in his life,

17   that he would change basically his home life as he described

18   the abuse that both he and his siblings and his mom endorsed at

19   the hands of his father.

20        His sister describes that his stepdad would abuse him

21   to the point of punching him for what seems like unusual

22   reasons, for bringing a comforter into the living room is one

23   specific instance, where for really no explicable reason he's

24   subject to this physical abuse.

25        And so it's this sort of environment that he's living

1  in and being raised in that again puts him at a higher risk for

2  the sort of behavior he's before the Court for now.

3          Living independently from his parents, again we go

4  back to Mathew dealing with his traumas and specifically the

5  loss of his brother resulting in substance abuse or greater

6  substance abuse to try to cope with that and essentially

7  finding himself out on the street, not having a place to live.

8          Described by family friends how Mathew essentially

9  couch surfed because he couldn't live with his parents so he

10  would live with family friends and try to continue going to

11  school, but clearly not living with the supportive parents as

12  he's growing up in his teenage years.

13          Having family members use substances also puts him at

14  a greater risk, and we have descriptions of his biological

15  father coming home drunk regularly; his mother admitting to

16  alcohol abuse after the death of her son; and his brother

17  himself, Kevin dying of a substance overdose.  So he certainly

18  was at a greater risk factor because he had family members who

19  were using substances.

20          Again, school maladjustment being another risk factor.

21  In the presentence investigation report it's confirmed Mathew

22  dropped out of school at grade ten, at the 10th grade.  It's

23  not surprising that would be the outcome if he's not living

24  with his family, if he doesn't have structure, if he doesn't

25  have support, if he's dealing with an abusive environment, and

1    so now he's moving from one house to the next just to have a

2    place to stay.  And instead of worrying about being successful

3    in school, he finds himself just trying to worry about where

4    he's going to lay his head the next day.

5            And so all of these risk factors match up with what

6    Mathew endured as a child.  And when you look at all of that

7    together, I mean, I think just based on common sense as much as

8    the research itself, it shouldn't be a surprise that Mathew

9    ended up running the streets and ultimately selling drugs.

10           I think that the -- as Dr. Sweeton described the

11   comparison of what people that served in the military, how

12   their PTSD exhibits itself in their behavior versus how it

13   exhibited itself in Mathew's behavior is a dangerous

14   comparison.

15           What we're talking about is Mathew suffering from

16   traumas throughout his childhood that led to this behavior

17   because in part of the lack of structure that he had versus a

18   group of people that we don't know what their childhood was.

19   It might have been that they came from an intact nuclear

20   family, went into the military, and then suffered great trauma

21   and as a result suffered from PTSD and had different types of

22   behaviors.

23           I think that Mr. Clark's criminal history is

24   consistent with his childhood.  The only violent offense that's

25   in his criminal history was a battery -- misdemeanor battery

1    when he was a juvenile, and as we found out, that was actually

2    the result of him trying to protect his younger sister when she

3    was getting beat up in the neighborhood.

4            And other than that, what we essentially see in his

5    history is property crimes, drug-related crimes, and then

6    failure while he's on supervision.  But if we think again about

7    the sort of support system that Mathew actually didn't have

8    during those time periods, none of that is surprising.  And in

9    fact, you know, I would argue that it would have been

10   surprising if he had been successful on supervision given the

11   lack of support that he had.

12           And yet over the last several months while he's been

13   at CoreCivic, which has been nothing short of a disaster

14   recently, he's done things to try to improve himself.  He's

15   engaged in programming that's been available.

16           At the time that I wrote the sentencing memorandum and

17   addendum, I wasn't sure if Mr. Clark had access to any more

18   programming over the last month because it was difficult for us

19   to have a conversation given the fact that CoreCivic has been

20   on lockdown for nearly five weeks now.

21           I've since found out that it wasn't available.

22   This -- these programs were available through the tablets that

23   CoreCivic installed, and once they went on lockdown, they took

24   all of those away.  So any programming that was there for a

25   period of, it looks like, I think late May until the end of

1  July was no longer available.  So he couldn't engage in any

2  more at that point.

3       But during the time that he could, he did, and I think

4  that that is certainly worth noting, and we would ask the Court

5  to consider that in coming to a conclusion about his sentence.

6       All of these other factors that we've raised through

7  sentencing memorandums and addendums, I think I've fleshed out

8  many times, and I'm not going to spend any more time talking

9  36 25.

10      About it today.

11      We're asking for a sentence of 180 months.  It is a

12  downward variance.  It's still 60 months higher than the

13  statutory minimums of the two controlling counts.  And it's

14  still 15 years, and 15 years is a long time.

15      After 15 years we think that Mr. Clark can be

16  successful.  He's shown that he's motivated to do so, and I

17  believe that 15 years meets all of the criteria that the Court

18  is to consider under 3553(a).  It is a substantial sentence and

19  we believe it is also an appropriate one, so that's our request

20  at this point, 180 months total.

21      THE COURT:  Mr. Hunt.

22      MR. HUNT:  Your Honor, the bottom line here is the

23  government believes that this Court got it right the first time

24  in the original sentencing.

25      I think that's predicated on the fact that the Court

1    recognized that this defendant isn't somebody who just uses

2    drugs.  It's an individual who was a mid-level drug dealer in

3    this area dealing a dangerous drug.  He had 11 firearms, and

4    one of those firearms had a 100-round capacity magazine.  He

5    had surveillance video in his house, and this was a serious

6    business.

7           And to paraphrase back what the Court said at the last

8    sentencing was that the Court would be more akin with respect

9    to the argument, and I'll call it the methamphetamine argument,

10   that the defendant has raised for a variance, to go along with

11   that if this was an individual who was a small town dealer or a

12   person who just got a really pure batch of drugs, but that's

13   not the case here.  I think the Court got it right.  He is what

14   the Court characterized and what the PSR and the facts show.

15          In some respects Mr. Clark benefits by the fact that

16   this case is on remand because he has been able to have the

17   time to avail himself of the resources.  Whether that is

18   sincere or not, I can't tell you.  I don't think the Court

19   knows.  That's a determination the Court is going to have to

20   make and is obviously well equipped to make.

21          I think the information that's been provided both as

22   incorporated in the government's response in Document 34, the

23   case *U.S. v. Godinez-Perez* where Mr. Burdick and I litigated

24   this before you as well as the information that's been provided

25   here about the issue.

1          Obviously Congress has tasked the Sentencing

2    Commission with formulating the guidelines, and the guidelines

3    are there for a reason.  Obviously we don't dispute the fact

4    that courts can vary.  We just request that the Court not do

5    that.

6          The sentence that the Court is proposing -- I'm sorry,

7    impose and the government asks it to reimpose was at the low

8    end of the guideline range, and I think that that is something

9    too that was appropriately done.

10         With respect to the information which would be the

11   only new information that was testified to here today by

12   Dr. Sweeton, obviously he has -- I'm sorry, she has examined

13   the defendant and has diagnosed him with PTSD.

14         I think that the evidence shows that not all people

15   who are diagnosed with PTSD become criminals.  Not all people

16   become drug dealers and not all people become dealers of the

17   scale of this particular defendant.

18         Now, Mr. Burdick talked about the analogy you can't

19   compare people with a diagnosis like the defendant versus

20   people in the military.  Well, one of the things we see in the

21   report is that the defendant said, you know, he had been shot

22   at 17 times, I think.  I would hazard a guess that people in

23   the military who require treatment were in combat, and that is

24   obviously probably why they're there because of what they have

25   experienced in a war setting.

1          Dr. Sweeton also indicated that if a defendant doesn't

2   follow through with the treatment that has been recommended,

3   that he still is at a very high risk of recidivism.  We know

4   that prior sentences -- convictions and sentences and have not

5   deterred the defendant, and so I think that that is something

6   the Court can consider.

7          And the Court is going to make this decision based

8   upon what it thinks this defendant is going to do in prison,

9   whether he's sincere or not, or whether he's just basically

10  doing what a lot of people do if you're around long enough, and

11  that is taking classes and saying things to this Court -- to

12  other courts that are designed, one, to get less of a sentence

13  and then they go back.  Or is he the type of person where it is

14  actually sincere?  Time will tell.

15         And I think this is an appropriate sentence, but

16  obviously the Court has to make that determination, and, you

17  know, that is basically what I have to say about that.

18         Judge, unless the Court has any additional questions

19  for me, we're making the same recommendation, and we hope that

20  you impose the same sentence.  Obviously that is even in light

21  of the testimony you've heard today.

22         THE COURT:  Mr. Burdick, do you have anything more?

23         MR. BURDICK:  Judge, I would just point out that we're

24  not claiming that Mr. Clark is simply a drug user.  If that

25  were the case, we wouldn't be here, and I don't think we ever

1    made that claim nor have we run away from the fact of the

2    amount of drugs that he's been charged with, the number of

3    firearms that were found in his house.

4             That's exactly why we provided to the Court a

5    comparison of Mr. Clark to another person in almost the exact

6    same situation, and this person in the same district ended up

7    with a sentence of 114 months lower than Mr. Clark.

8             And so I just -- I think that that's certainly

9    relevant information for the Court to consider.  And we've not

10   tried to downplay Mr. Clark's criminal behavior.  I just think

11   that 270 months is just too much.

12            So that's it.  That's all I've got.

13            THE COURT:  All right.  Thank you.

14            So I'm going to proceed with ruling on the objection

15   to the presentence report, and then I will announce proposed

16   findings of fact and a tentative sentence and as part of that

17   rule on the motion for variance as well.

18            Mr. Clark, you have the opportunity to address me

19   directly if you'd like to.  I first announce a tentative

20   sentence and then later make a final decision and announce a

21   final sentence.  You can address me now if you'd like to or you

22   can address me after I've announced a tentative sentence,

23   whatever your choice is.

24            THE DEFENDANT:  I'll address you now.

25            THE COURT:  Okay.  Go ahead.

1        THE DEFENDANT:  I'd like to thank my family and

2   friends for showing up to support me today.  I also would like

3   to thank from the bottom of my heart my attorney, Mr. Burdick,

4   for all his hard work on my case.  I sincerely appreciate it.

5   I'd like to thank Dr. Sweeton for testifying on my behalf also.

6        Your Honor, I just want to humbly ask for your mercy

7   in my case and to please consider giving me 180 months.

8        I plan on taking full advantage of the rest of my

9   sentence to get my GED and to learn and accomplish as many

10  trades and programs to prepare me for the rest of my life.

11       I just want to succeed when I get out.  I want to get

12  into real estate, buying/selling rented houses, along with

13  other legitimate businesses.

14       Your Honor, I have truly learned my lesson, believe

15  me.  Just in the last five years I've become traumatized with

16  things that I've seen and been through at the USP I was at and

17  also at CoreCivic, which believe it or not was so much worse

18  than the USP I was in, Pollock USP, one of the worst in the

19  United States, yet I still stayed focus on achieving my goals

20  to better myself and preparing me to reenter society.

21       Your Honor, when I am released, I will walk my

22  probation with no problems or violations so I can put all this

23  behind me and move on with my new life sober and focused on

24  achieving my goals to become a legit member of society.

25       Thank you, Your Honor.  I appreciate you and the

1   Court's time.  God bless.

2          THE COURT:  Thank you, Mr. Clark.

3          All right.  First, let's -- as far as the objection to

4   the presentence report, I'm going to overrule and deny that.

5   This is a legal issue I understand that Mr. Clark wants to

6   preserve for the record, but I think the guidelines are

7   appropriately applied, that the 91 grams of methamphetamine

8   that were seized from Mr. Clark's residence are relevant

9   conduct under the definition and provisions of guideline 1B1.3

10  and Tenth Circuit case law including *United States v. Cassius*.

11         Mr. Clark was engaged in the distribution of

12  methamphetamine.  He was distributing it in part from the

13  residence from where it was seized.  There were all kinds of

14  indicia seized or evidence seized at that location that were

15  evidence that he was engaged in the distribution of

16  methamphetamine.

17         There was evidence concerning packaging it for resale.

18  There was firearms.  There was cash.  There were surveillance

19  cameras, various drug paraphernalia.  So it does definitely

20  qualify as relevant conduct and appropriately is calculated as

21  part of the sentence under the sentencing guidelines.  So I

22  will overrule and deny that objection.

23         So Mr. Clark has moved for variance on a number of

24  grounds, some of them are policy driven.  And in his original

25  sentencing memorandum that was filed, Document 32, back in

 1    August of 2017 those arguments were made.

 2          Mr. Clark has also filed a sentencing memorandum

 3    addendum for purposes of today's hearing, Document 83, seeking

 4    a variance to a total of 180 months, which would be 120 months

 5    on Counts 1 and 2, and five years on Count 3, which of course

 6    the Court can't vary from on Count 3.  That's a mandatory five

 7    years consecutive to all other counts.

 8          And the addendum raises some additional grounds for

 9    variance, and primarily focused on Mr. Clark being at CoreCivic

10    now for some period of time, I think 21 months or so, in which

11    he's engaged in a lot of work and has I think 34 certificates

12    of completion of coursework while he was there, even while

13    being incarcerated at a place that has become increasingly

14    violent.

15          The only way I could describe it frankly, what's going

16    on at CoreCivic right now is it's an absolute hell hole.  The

17    Court is aware of it.  The defense bar is aware of it.  The

18    prosecutors are aware of it.  The United States Marshals are

19    aware of it.  He's doing his best to get people moved as soon

20    as the United States Marshal Service nationally can negotiate

21    contracts with other facilities.

22          So that's no news to me as well, all that's going on

23    there and causing trauma to everybody -- guards are being

24    traumatized.  Guards have been almost killed.  Detainees are

25    being traumatized with assaults and batteries, and not long ago

1    a detainee was killed.  So I'm well aware of the situation at

2    CoreCivic and very troubled by it as well.

3            As far as the policy arguments that have been made, I

4    mean, I think there is some legitimacy to some of these

5    arguments, although I think much of this is something that

6    Congress and the Sentencing Commission need to address,

7    particularly with regard to the difference between

8    methamphetamine and other drugs, the disparities there, and

9    some may argue inappropriate disparities based on the harm of

10   methamphetamine versus other drugs.  That's a policy argument

11   but not one that I'm particularly persuaded by at this point.

12           The conversion of cash-to-drug equivalency, I'm not

13   persuaded by as well either because we do that in a very

14   conservative way and the most conservative way based on street

15   prices and the lowest price or the lowest wholesale price

16   depending on who the drug deal is and the level that they deal

17   at.  Not particularly persuaded by that.

18           I do think and I agree that as someone ages, the

19   likelihood of recidivism does go down.  Mr. Clark is relatively

20   young, however.  He is -- I want to say 30.  He is now 31.  So

21   still relatively young.  But surely with a long sentence I

22   think we can anticipate that the likelihood of recidivism does

23   go down.

24           But as Dr. Sweeny testified, there are a lot of risk

25   factors that convince the Court that Mr. Clark does have a

1    strong likelihood of recidivism.  I'm also weighing that

2    against his most recent behavior, which goes the other way, in

3    terms of him demonstrating through taking 34 classes and

4    getting certificates of completion that now perhaps at the age

5    of 31 and after having lived through 31 years of a

6    trauma-filled life, he is trying and he does want to make a

7    change in his life.

8            So I've given some credit to that.  I'm really

9    persuaded by the argument of there being a very disparate way,

10   a very -- I don't know, unexplainable way in terms of how

11   methamphetamine is calculated, the quantity whether it's

12   treated as actual, mixture, or ice.

13           Now, in this case I believe the quantities were

14   primarily 100 percent which, you know, it's appropriate to

15   treat that as ice.  Anything over 80 percent it's appropriate

16   to treat as ice, and from the Court's experience, virtually

17   everything we see in court is over 80 percent.  Most of it is

18   over 90 percent.  Most of it is over 95 percent.

19           Yet there are these disparities across the country and

20   even within this district as to whether it's calculated as ice

21   or not.  In this case it was calculated as ice, and maybe

22   appropriately so, but I'm convinced that if this defendant were

23   sentenced in another division in this court or clearly outside

24   of this district, it may have been treated as a mixture or

25   something different.  So that is something that persuades me as

1   well in terms of granting some variance.

2        I think primarily, though, in considering the Section

3   3553 factors, the difficulty I have is on the one hand

4   Mr. Clark presents as someone that I'm convinced does have PTSD

5   and has suffered trauma his entire life.  I mean, we can talk

6   about the horrible event of losing his brother to an overdose

7   in 2004, but according to the presentence report and based on

8   an interview with Mr. Clark, he was using drugs by then.

9        He was introduced to drugs at such an early age that

10  it is not at all surprising that he had all of the problems he

11  had going forward.  When he was introduced to drugs at a very

12  young age before his brain had fully developed, how he could

13  not have had problems in school, how he could not have had

14  problems with concentration and following the rules, and I mean

15  all of that would have been very difficult just based on the

16  fact that he was introduced to drugs at such a young age.

17       Third grade, third grade was when he was introduced to

18  marijuana, and I'm not putting that on Mr. Clark.  I'm putting

19  that on whoever he was around that would introduce a 7- or

20  8-year old to marijuana.  That's evil.  That's just pure evil.

21       And he continued to use drugs through elementary and

22  middle school.  At the height of his use, he reported smoking

23  marijuana all day, reported that it was his drug of choice.  By

24  the age of 15 he had tried cocaine, mushrooms, and ecstasy.  At

25  15 he tried meth for the first time.  At the time of his arrest

1  he was an intravenous meth user.  All of this obviously

2  contributed to his extensive criminal history that has caused

3  great difficulties in the community.  Property crimes, drug

4  crimes, all of that.

5       But when I heard Dr. Sweeton testify and about what

6  happened in 2004 and that being a defining experience to

7  Mr. Clark, I also remember that by then he was already using

8  drugs because somebody, some evil person introduced him to

9  drugs when he was 7 or 8 years old and it went from there.

10      He grew up in a trauma-filled household subjected to

11 physical, mental, and emotional abuse.  He had to live in fear

12 with a father who shot a gun off to show people that he was

13 angry and would punch him.  The letter he wrote to his teacher

14 is probably a cry for help that didn't come.

15      So Mr. Clark has had, you know, 30 years really,

16 31 years now of trauma in his life, and I take that into

17 consideration.  At the same time I think we all know that what

18 Mr. Clark did that led to this conviction surely has led to

19 trauma in other people's lives because when you sell

20 methamphetamine and those parents go into their household and

21 abuse or neglect their children, those children are being

22 traumatized too.

23      That's the difficulty in sentencing in a situation

24 like this.  I want to give credence to the fact that Mr. Clark

25 had some external things imposed upon him that weren't his

1   fault, but I also have to give credence on the harm that he's

2   caused to the community through his conduct.  So I take all of

3   that into consideration.  That's why it's so difficult to be a

4   judge, frankly, and to see all of this through the lens of

5   Mr. Clark and what he went through but also to see it through

6   the lens of the community and the harm that he's imposed on the

7   community.

8          So I've taken all of that into consideration.  I am

9   going to grant a variance, and a lot of it is because of what

10  Mr. Clark has demonstrated over the last 21 months.  Now, maybe

11  he's not sincere, but -- I don't have a crystal ball, but I

12  believe that someone that takes 34 classes and completes them

13  at CoreCivic in less than 20 months is really making an effort

14  to change.

15         And you're right, but for this remand and the

16  opportunity to resentence Mr. Clark, I wouldn't be aware of

17  that.  That's why many people in our system argue that a

18  sentencing judge should have a second look to see how somebody

19  is doing at some point during incarceration.  We don't have

20  that system except for when somebody comes back for sentencing

21  because of some legal issue, which is what happened here.

22         But I do want to give credence to that because that

23  matters, and I know there are a lot of people at CoreCivic that

24  don't do that, that don't make an effort, that aren't ready to

25  change.  And Mr. Clark has done the best he can in my view of

1    demonstrating to us that he wants to change.

2         Dr. Sweeton is exactly right; Mr. Clark is going to

3    need so many services.  He needs them in prison.  He's going to

4    need them when he gets out.  I went down the checklist of what

5    she was talking about, and the conditions for release when

6    Mr. Clark comes out of prison are matching up with what she

7    said, but I am going to add a condition for mental health

8    treatment because that's going to be imperative.

9         I already had a condition for cognitive behavioral

10   therapy, which is something that she mentioned, and when you're

11   exposed to drugs at the age of eight years old, you've got big

12   cognitive deficits in terms of thinking, judgment, and all of

13   that, so he's going to need a lot of support there.

14        It's interesting that Dr. Sweeton talked about he

15   can't go back to the same environment.  She's exactly right.

16   Mr. Clark is not going to be able to go back to his family.

17   He's not going to be able to go back to his peer group and his

18   friends.  He's probably going to need to be in a halfway house

19   and then find some other -- with the help of probation, some

20   other living arrangement because one of the biggest risk

21   factors Mr. Clark has is his history, his environment, his

22   peers.  That would include his family because they've had some

23   problems as well.  And so I think Dr. Sweeton was right on

24   target with all of that.

25        So I'm going to announce a variance.  This is still

1   going to be a very significant sentence, it should be, because

2   this was a very significant crime, and we can't lose sight of

3   that.  And there's a lot of reasons under the sentencing

4   statute to impose a significant sentence under this case for

5   all of the reasons that I've said.

6          So the total offense level -- and this is just

7   proposed findings of fact and tentative sentence at this point.

8   The total offense level in this case is 33, and the criminal

9   history category is five.

10         The statute on Count 1 sets a mandatory minimum of

11  five years, a maximum of 40 years.  The guideline range on

12  Count 1 is 210 to 262 months.  On Count 2 the statutory maximum

13  is 20 years, and the guideline range would be 210 to 240 months

14  on Count 2.

15         The Court's tentative sentence on Counts 1 and 2,

16  which will run concurrent, is 140 months.

17         And on Count 3, 60 months, 5 years consecutive to

18  Counts 1 and 2, so that's a controlling sentence of 200 months.

19         The statute and guidelines set this mandatory sentence

20  of five years consecutive to all other counts on Count 3, so

21  the variance is essentially 70 months on the controlling

22  sentence.  The bottom of the guideline range would be

23  210 months.  I'm varying down 70 months based on all of the

24  things and factors that I've mentioned.

25         So that's the controlling sentence of 200 months on

1    all counts that I've tentatively announced.

2          In terms of supervised release, five years on Counts 1

3    and 3 concurrent, three years on Count 2 concurrent, for a

4    controlling supervised release term of five years.

5          The statute on Count 1 sets a mandatory minimum of

6    four years and life as a max on supervised release.  On Count 1

7    the guidelines recommend four to five years of supervised

8    release.  On Count 2 the statute sets a maximum three years of

9    supervised release.  The guideline range is one to three years.

10         And then on Count 3 the statute sets a maximum five

11   years of supervised release.  The guidelines recommend two to

12   five years.

13         And then five years tentatively an Counts 1 and 3,

14   three years on Count 2 to run concurrent.

15         Mr. Clark is not eligible for probation under the

16   statute and guidelines.

17         I do not intend to impose a fine.  The maximum fines

18   under the statute are 5 million on Count 1; 500,000 on Count 2;

19   250,000 on Count 3; and then the guidelines recommend between

20   $35,000 and $5,000,000.

21         There is no restitution in this case.  Per statute and

22   guidelines the sentence must include a $100 special assessment

23   on each of Counts 1, 2, and 3 for a total of $300.

24         I do not intend to impose a denial of federal

25   benefits.  Under the guidelines and statute on Count 1 I could

1   impose up to one year denial.  Again, Mr. Clark is going to

2   need a lot of services.  That might include federal benefits

3   because we want him to be successful when he is released, so

4   I'm not going to impose that.

5           The Court is required pursuant to 18 U.S.C. Section

6   3553(a) to impose a sentence that is sufficient but not greater

7   than necessary to comply with the purposes of sentencing

8   identified in the statute.

9           In determining the particular sentence to be imposed,

10  the Court has considered the sentencing guidelines because they

11  promote uniformity in sentencing and assist the Court in

12  determining an appropriate sentence by weighing the basic

13  nature of the offense as well as aggravating and mitigating

14  factors.

15          But in this Court's view a variance is appropriate in

16  this case because despite the advantages of the sentencing

17  guidelines, the sentencing guideline range in this case is

18  greater than necessary in the Court's view to comply with the

19  purposes of sentencing.

20          The Court has considered the statements of the

21  parties, the evidence presented in this case, the sentencing

22  memoranda, the addendum to the sentencing memoranda, the

23  presentence investigation report, the statements of counsel,

24  and Mr. Clark's allocution.

25          After reviewing the presentence report, the Court

1   finds that the guideline range of 210 to 262 months on Counts 1

2   and 2 is correctly calculated based on the total offense level

3   of 33 and criminal history Category 5.  Additionally, Mr. Clark

4   is subject to five years on Count 3 consecutive to all other

5   counts.

6           This offense involves Mr. Clark distributing

7   methamphetamine out of his residence.  He possessed several

8   firearms which were located in his home in furtherance of the

9   crime.  One of the firearms recovered was a semiautomatic

10  firearm with a large capacity magazine, specifically a DSA Inc.

11  Model ZM4 5.56-caliber rifle, which was equipped with 100 round

12  drum magazine.  I had never seen one of those magazines until

13  this case, by the way.  I've since seen them unfortunately.

14          This magazine was loaded with 85 rounds of .223

15  ammunition.  The nature of this weapon increases the risk of

16  danger that Mr. Clark posed to the community.

17          After considering all of these factors and the

18  advisory sentencing guidelines and the nature and circumstances

19  of the offense and Mr. Clark's history and characteristics, the

20  Court has decided to sentence him to a term of 140 months on

21  Counts 1 and 2 to run concurrently followed by 60 months on

22  Count 3 to run consecutive for a controlling term of

23  200 months.

24          I will note for the record that had Mr. Clark's

25  methamphetamine amounts been calculated to be actual rather

1  than ice, this variance of 140 months would have been within

2  the resulting guideline range for Counts 1 and 2.

3        This sentence shall be followed by a supervised

4  release term of five years on Counts 1 and 3 and three years on

5  Count 2 to all run concurrently.

6        The Court believes that such a sentence is sufficient

7  but not greater than necessarily to reflect the seriousness of

8  the offense.  As I said, this was a very serious offense and

9  one that posed great and grave danger to the community based on

10  not only the quantities of drugs but the types of firearms and

11  ammunition and magazines that Mr. Clark possessed and his

12  surveillance system, all of this suggested that this could have

13  gone bad and gone bad in a very significant way for a lot of

14  people.

15        It's a sentence that promotes respect for the law and

16  provides just punishment.

17        Further, the sentence should afford adequate

18  deterrence to criminal conduct and protect the public from

19  further crimes of Mr. Clark.  That's a great societal interest

20  in this case based on Mr. Clark's criminal history and the need

21  to protect the public from further crimes.

22        I say that, although I really want to believe based on

23  what I've seen that Mr. Clark has every intention of not being

24  a recidivist and abiding by the terms of supervision and not

25  committing any other crimes.

1         The term of supervised release in addition to the

2   imprisonment sentence will allow Mr. Clark the opportunity to

3   receive correctional treatment in an effective manner and

4   assist with community reintegration because that's what we want

5   most, Mr. Clark.  We want you to do better.  We want to

6   integrate you in the community, get you employed so that you

7   can have a good life because you deserve a good life going

8   forward.

9         The Court does not intend to impose denial of federal

10  benefits as it is not a necessary punitive sanction in light of

11  the imprisonment sentence the Court intends to impose.

12        Mr. Clark is ordered to pay a total of $300 special

13  assessment, that's $100 per count, to the Crime Victims Fund,

14  but imposition of a fine is waived due to his inability to pay.

15        Also, the Court intends to order forfeiture of the

16  property outlined in the administrative order of forfeiture

17  that was filed on December 15, 2016.

18        The Court intends to impose the mandatory and special

19  conditions of supervision set forth in part D of the

20  presentence report, but the Court is going to add one

21  additional condition.  You must participate in an approved

22  program for mental health treatment and follow the rules and

23  regulations of that program which may include psychological

24  counselling.  You must contribute toward the cost to the extent

25  you are financially able to do so.

1        The nature of the offense and the history outlined in

2   the presentence report warrant the special conditions outlined

3   in the presentence report.  First, Mr. Clark's admitted history

4   with drugs including marijuana and methamphetamine necessitate

5   conditions for drug testing and treatment if necessary.

6        Additionally, his drug history, his criminal record,

7   the nature of the incident offense all warrant the condition

8   for cognitive behavioral programming which works to address

9   criminal thinking and to promote prosocial behaviors.

10       Due to the nature of the offense as well as

11  Mr. Clark's history of burglary, possessing drugs, and fleeing

12  from law enforcement, a condition for search when based upon

13  reasonable suspicion is warranted to provide protection to the

14  public from further crimes of Mr. Clark.

15       Mr. Clark is presently in custody, so voluntary

16  surrender is not appropriate.

17       Are there objections by the government to the sentence

18  as tentatively announced?

19       MR. HUNT:  Yes, Judge.  We think that a low end

20  guideline sentence cumulatively of 270 months as first imposed

21  at the first sentencing is appropriate, and we reserve our

22  right to appeal.  That is not to say that the government will

23  appeal.  We just reserve our right.

24       THE COURT:  All right.  So noted.

25       Is there an objection by the defendant, preserving

1   your one objection of course to the presentence report?

2           MR. BURDICK:  No other objection, Judge.  And we would

3   ask that the Court make a recommendation for placement in FCI

4   Greenville for Mr. Clark.

5           THE COURT:  Is that where he was before?

6           MR. BURDICK:  No.  We believe he should be able to get

7   out of a USP at this point and into an FCI, and so that's our

8   request.

9           THE COURT:  Okay.  All right.  Mr. Clark, anything

10  more from you before I make a final decision and announce a

11  final sentence?

12          THE DEFENDANT:  No.

13          THE COURT:  All right.  The Court determines that the

14  presentence investigation report as corrected or modified by

15  the Court and the previously stated findings are accurate and

16  orders those findings incorporated in the following sentence.

17          Pursuant to the Sentencing Reform Act of 1984 it is

18  the judgment of the Court that the defendant, Mathew Clark, is

19  hereby sentenced to the custody of the Bureau of Prisons for a

20  term of 140 months on Counts 1 and 2 to run concurrent,

21  followed by 60 months on Count 3 to run consecutively to Counts

22  1 and 2, for a controlling term of 200 months.

23          This term of imprisonment shall be followed by five

24  years of supervised release on Counts 1 and 3 and three years

25  on Count 2 all to run concurrently.

1        I will recommend that Mr. Clark be designated to FCI

2   Greenville.

3        Within 72 hours of release from the custody of the

4   Bureau of Prisons, Mr. Clark shall report to the U.S. Probation

5   Office in the district in which he is released.  While on

6   supervised release, he shall comply with the mandatory and

7   standard conditions adopted by this Court and the special

8   conditions of supervision set forth in part D of the

9   presentence report.

10       It is ordered Mr. Clark shall pay the United States a

11  special assessment of $100 per count for a total of $300 to the

12  Crime Victims Fund pursuant to 18 U.S.C. Section 3013.  Payment

13  of the assessment is due immediately and may be satisfied while

14  in Bureau of Prisons custody.

15       Imposition of a fine is waived.

16       The administrative order of forfeiture is made final

17  as to Mr. Clark and shall be incorporated in the judgment.

18       Both the government and defendant are advised of their

19  respective rights to appeal this sentence and conviction.  An

20  appeal taken from this sentence is subject to 18 U.S.C. Section

21  3742.

22       Mr. Clark is advised that it is your right to appeal

23  the conviction and sentence, but you also can lose your right

24  to appeal if you do not timely file a notice of appeal in the

25  district court.

1    Rule 4(b) of the Federal Rules of Appellate Procedure

2 gives you 14 days after the entry of judgment to file a notice

3 of appeal.  If you request, the clerk of the court shall

4 immediately prepare and file a notice of appeal on your behalf.

5 If you are unable to pay the cost of an appeal, you have the

6 right to apply for leave to appeal in forma pauperis.

7    Mr. Hunt, I show no counts or charging documents

8 subject to dismissal?

9    MR. HUNT:  That's correct, Your Honor.

10    THE COURT:  Okay.  I'll remand Mr. Clark to the

11 custody of the U.S. Marshal Service pending designation by the

12 Federal Bureau of Prisons.

13    And we will be in recess until 3:00.

14    (The proceedings were adjourned.)

15              C E R T I F I C A T E

16    I, Danielle R. Murray, a Certified Court Reporter and the

17 regularly appointed, qualified, and acting official reporter of

18 the United States District Court for the District of Kansas, do

19 hereby certify that the foregoing is a true and correct

20 transcript from the stenographically reported proceedings in

21 the above-entitled matter.

22    SIGNED 15th of September, 2021

23

24          /s/Danielle R. Murray
          DANIELLE R. MURRAY, RMR, CRR
          United States Court Reporter

25